**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| NATURE COAST COLLECTIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action |
| | § | No. C-06-273 |
| CONSORTIUM SERVICE MANAGEMENT | § | |
| GROUP, INC., DONALD S. ROBBINS | § | |
| AND GORDON W. ALLISON, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER VENUE**

On this day came on to be considered Defendants Consortium
Service Management Group, Inc. ("Consortium), Donald S. Robbins,
and Gordon W. Allison's (together, "Defendants") opposed motion to
transfer venue to the United States District Court for the Northern
District of Illinois, Eastern Division (D.E. 35).  For the reasons
set forth below, Defendants' motion is hereby GRANTED, and this
case is hereby transferred, pursuant to 28 U.S.C. § 1404(a), to the
United States District Court for the Northern District of Illinois,
Eastern Division, so that the case can be referred to the United
States Bankruptcy Court for the Northern District of Illinois,
Eastern Division, to proceed before Chief Judge Eugene R. Wedoff.[1]

---

[1]The Court notes that on October 25, 2006, Defendants filed a
motion for leave (D.E. 39) to file a reply in support of their
motion to transfer.  The Court finds that good cause exists to
allow Defendants to file their reply, and the Court hereby GRANTS
Defendants' motion for leave.

## I.   Jurisdiction

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

## II.   Factual and Procedural Background

Plaintiff Nature Coast Collections, Inc. ("Nature Coast") filed its Complaint against Defendants on June 30, 2006.  (D.E. 1, Complaint).  Nature Coast alleges claims for breach of contract and promissory estoppel against Defendants on a series of four promissory notes, which were executed on May 21, 2001, July 2, 2001, August 20, 2001 and January 1, 2002.  (Complaint, ¶¶ 7-24). The sum total for these four outstanding promissory notes is $630,000, excluding interest.  (Id. at ¶¶ 7-8).

Plaintiff Nature Coast was not the actual entity that lent money to Consortium via the above-referenced promissory notes. Rather, the notes were funded by Stonegate Management Group, Ltd. ("Stonegate"), an investment fund operating out of Costa Rica. (Id.).  On August 29, 2005, Stonegate assigned all of its rights in the four promissory notes to Nature Coast, in exchange for ten dollars.  (Id. at ¶ 8).  Nature Coast was incorporated solely to serve as a United States domestic entity to collect on the promissory notes issued by Stonegate.   (D.E.  32,  Amended Certificate of Interested Parties; D.E. 38, Exh. B, Shaw Decl., ¶

2; D.E. 35, Exh. A, Fla. Tr., 53:20-22).

Consortium entered into the promissory notes in order to secure financing for transportation and operation of a "gas scrubber" that was supposed to extract carbon dioxide and other particles from waste gas, so as to sell the gas for energy purposes. (D.E. 22, Defendant's Counterclaim, ¶¶ 1, 11; D.E. 33, IPTC Tr., 8:18-21). Consortium contracted with Resource Technology Corporation ("RTC") to use the scrubber to extract carbon dioxide from the waste gas and produce a saleable energy product. (Counterclaim, ¶ 11; IPTC Tr., 14:1-2).[2]

The scrubber first arrived in the United States in Texas, to be used at a Texas landfill.[3] (Counterclaim, ¶ 12). However, RTC informed Consortium that due to licensing problems, the scrubber would have to be moved to another landfill in Alabama. (Id. at ¶ 13). Defendants worked with another entity, Banco Panamericano, Inc. ("Banco Panamericano"), to provide financing for the transfer of the scrubber from Texas to Alabama.[4] (Id. at ¶ 15). Banco

---

[2]RTC is currently a debtor in a Chapter 11 Bankruptcy proceeding, In re Resource Technology Corporation, Case No. 99-B-35434, United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, before Chief Judge Eugene Wedoff. Consortium and RTC have been involved in litigation before Judge Wedoff, and they have reached a settlement that frees up the gas scrubber equipment. (IPTC Tr., 14:1-2).

[3]The scrubber came to the United States from the Ukraine.

[4]Defendants allege that RTC introduced Consortium to both Stonegate and Banco Panamericano. (Counterclaim, ¶¶ 11, 15). Defendants allege that Banco Panamericano is an RTC affiliate.

Panamericano provided the financing via a promissory note.  (Id. at
¶ 19).   When the scrubber arrived in Alabama, it turned out that
due to various circumstances, the scrubber would not be able to
produce saleable gas out of the Alabama landfill. (Id. at ¶ 17).

Defendants allege that they only entered into the RTC contract
and the Stonegate and Banco Panamericano promissory notes as a
result of various misrepresentations by RTC.[5]  (Id. at ¶ 24; IPTC
Tr., 13:18-14:6).   Defendants allege that RTC never actually
intended to produce saleable gas from the Alabama landfill, and
that RTC's goal was only to seek valuable tax credits from the
federal government.   (Counterclaim, ¶¶ 24-29; IPTC Tr. 13:18-
14:18).

**A.    <u>Defendants' Counterclaim Against Nature Coast</u>**

On August 21, 2006, Defendants filed their Answer and
Counterclaim (D.E. 22) to Plaintiff's Complaint.  Defendants admit
that they signed the promissory notes, that the notes were funded,
and that they did not make payment on the notes.  (Answer, ¶¶ 7-
27).   However, Defendants counterclaimed against Nature Coast for
fraud, claiming that Nature Coast is an affiliate of RTC, and that
Nature Coast participated in an RTC-led scheme to defraud

---

(Id. at ¶ 16).

[5]For example, Defendants allege that RTC represented that it
could obtain a waiver to sell gas that contained 1% oxygen, even
though this was ten times the legal oxygen level, and no such
waiver was available.  (Counterclaim, ¶ 25).

Consortium.  (Counterclaim, ¶¶ 36-43).  Defendants request that the Court declare the Stonegate promissory notes null and void and unenforceable.  (Id. at p. 13).

B.   **Florida Lawsuit**

Shortly after Stonegate assigned its interests in the promissory notes to Nature Coast, Nature Coast filed suit against Consortium, Mr. Robbins and Mr. Allison in Florida state court. (D.E. 38, Response, p. 2; IPTC Tr., 11:12-12:20; See, generally, Fla. Tr.).   Defendants removed the case to the United States District Court for the Middle District of Florida.  (Id.).   The district court in Florida dismissed the case without prejudice, on the grounds that it did not have personal jurisdiction over the Defendants.  (Response, p. 2; IPTC Tr., 11:12-12:20).

C.   **Bankruptcy Proceedings in the Northern District of Illinois**

This Court takes judicial notice that the following proceedings are pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, before Chief Judge Wedoff:[6]

(1)  The RTC Chapter 11 proceeding, Bankruptcy Case No. 99-35434, In re Resource Technology Corp.   (See Docket Sheet,

---

[6]See Taylor v. Charter Med. Corp., 162 F.3d 827, 830 (5th Cir. 1998) ("[A] court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings") (internal quotation omitted).

Bankruptcy Case No. 99-35434).   This proceeding commenced in November of 1999, and is still pending today.  (Id.).

(2)  Adversary Proceeding No. 05-02685, <u>Banco Panamericano, Inc. v. Consortium Service Management Group, Inc., et al.</u> (hereinafter, "Banco Panamericano Adversary Proceeding").  (See Docket Sheet, Adversary Proceeding No. 05-02685).   Banco Panamericano originally filed this case against Consortium and a related entity (CSM Gastech LLC) in the Circuit Court of Cook County, Illinois, Case No. 05L001614.   (Banco Panamericano Adversary Proceeding, D.E. 5).  Banco Panamericano sued Consortium on the promissory note Banco Panamericano issued to Consortium for costs associated with the gas scrubber.  (Id.).   Consortium counterclaimed that the note was unenforceable due to fraud. (Id.).  On March 10, 2005, Defendants removed the case to the United States District Court for the Northern District of Illinois, where it was assigned to The Honorable Rebecca Pallmeyer.  (Id.). Defendants moved to refer the case to the United States Bankruptcy Court for the Northern District of Illinois, and the district court granted Defendants' motion, stating as follows:  "In light of Defendants' 'substantive consolidation' claims against Plaintiff Banco [Panamericano] and RTC, the motion by Defendants to refer this action to the Bankruptcy Court is granted.  Case is transferred to Bankruptcy Judge Wedoff."  (Banco Panamericano Adversary Proceeding, D.E. 1).

## III.  Discussion

### A.    Transfer of Venue Pursuant to 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Accordingly, even though venue of the instant case is proper in this Court, the Court may transfer the case to another federal forum where venue is proper, if such a transfer is for the convenience of parties and witnesses and in the interests of justice.[7]  Id.

It is Defendants' burden to demonstrate to this Court that it should transfer the case to the United States District Court for the Northern District of Illinois.  See Peteet v. Dow Chem. Co., 868 F.2d 1428, 1436 (5th Cir. 1989) (requiring the movant to make a showing that the forum sought is more convenient); Time, Inc. v. Manning, 366 F.2d 690, 698 (5th Cir. 1966).

As set forth below, this Court finds that Defendants have met

---

[7]The Court finds that venue of the instant case is proper in this Court, pursuant to 28 U.S.C. § 1391(a), since a "substantial part of the events or omissions giving rise to the claim" occurred in Texas. See Fla. Tr., 31:25-32:6, 61:20-22; 63:17-19.  The Court does not find Defendants' argument persuasive that the Illinois Bankruptcy Court has exclusive jurisdiction over this case, because the evidence offered by all parties does not establish that the promissory note debt is definitively part the RTC bankruptcy estate.  As set forth below, the Court does find that this case should be transferred pursuant to 28 U.S.C. § 1404(a), but the Court does not accept Defendants' argument that the case should be transferred pursuant to 28 U.S.C. § 1408(2).

their burden of showing that this case should be transferred.

**B.     This Case Could Have Been Brought in the Northern District of Illinois**

**1.     Bankruptcy Related-To Jurisdiction**

The threshold question under 28 U.S.C. § 1404(a) is whether the case "might have been brought" in the United States District Court for the Northern District of Illinois.  In re Horseshoe Entm't, 337 F.3d 429, 433 (5th Cir. 2003); see also In re Volkswagen AG, 371 F.3d 201, 202 (5th Cir. 2004) ("the first determination to be made is whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed.").

The Court finds that pursuant to 28 U.S.C. § 1409(a), this case could have been brought in the Northern District of Illinois. Section 1409(a) provides that "a proceeding arising under title 11 or arising in *or related to* a case under title 11 may be commenced in the district court in which such case is pending."  Id. (emphasis added).

A proceeding is "related to" a Chapter 11 bankruptcy case if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." In re Wood, 825 F.2d 90, 92 (5th Cir. 1987) (emphasis in original); see also Celotex Corp. v. Edwards, 514 U.S. 300, 308 n. 6 (1995) ("a related to proceeding is one the disposition of which ... in any way

impacts upon the handling and administration of the bankrupt estate.") (internal citations omitted).  Even if the outcome of the proceeding "may ultimately have no effect on the bankruptcy," venue is still proper unless the court "can conclude, on the facts before [it], that [the outcome of the proceeding] will have no *conceivable* effect" on the bankruptcy estate.   In re Wood, 825 F.2d at 94 (emphasis in original).

> ### 2.   Outcome of This Case Could Conceivably Effect RTC's Bankruptcy Estate

As set forth below, the outcome of the instant litigation could have a conceivable effect on the RTC bankruptcy estate.

> #### a.   George Calvert's Roles in Nature Coast and RTC

In Nature Coast's Amended Certificate of Interested Parties, Nature Coast states that "George Calvert is President, Treasurer, and Director of Nature Coast and ... Margot Calvert [George Calvert's wife] is Vice-President, Secretary, and Director" of the corporation.  (Am. Cert. of Interested Parties, ¶ 1).  Plaintiff has also submitted as evidence an affidavit of George Calvert, whereby he states that he incorporated Nature Coast, and confirms that he named himself and his wife as officers of the corporation.[8]

---

[8]Plaintiff argues that Mr. Calvert "merely" incorporated Nature Coast and named himself and his wife as the corporation's officers "because names of officers had to be provided at the time of incorporation."  (Response, pp. 7-8).  However, regardless of the reasons he now gives for his actions, *Mr. Calvert unequivocally named himself as President, Treasurer, and Director of Nature*

(Calvert Decl., ¶ 3).  In his affidavit, Mr. Calvert also confirms that from December, 1992 through April, 2001, he served as President of RTC, and from May, 2001 through October, 2001, he served as Chairman of RTC.  (D.E. 38, Exh. A, Calvert Decl., ¶ 2). Out of the four promissory notes at issue in this litigation, three were executed during Mr. Calvert's tenure as Chairman of RTC.  (<u>See</u> Complaint, promissory notes executed on May 21, 2001, July 2, 2001 and August 20, 2001).[9]  Accordingly, Nature Coast's President, Treasurer and Director (and husband of Nature Coast's Vice-President, Secretary, and fellow Director) was also Chairman of RTC at the time the majority of the promissory notes were executed.

### b.   <u>George Calvert's Role in ExtracTech</u>

After the Stonegate promissory notes were executed, Stonegate

---

***Coast***, and his wife was clearly named as Vice-President, Secretary, and Director of the corporation.  Moreover, it does not appear that Mr. Calvert ever removed (or attempted to remove) himself or his wife from their positions as Nature Coast's officers and directors. Regardless of Mr. Calvert's motivation, Mr. Calvert ***was and is*** involved with Nature Coast, and he cannot now attempt to negate his involvement because his role has become an issue in the litigation.

[9]Plaintiff makes an unpersuasive argument that it is significant that Mr. Calvert did not become involved with Nature Coast until 2005, while he retired from RTC in October, 2001.  2001 is actually the relevant time period in this case.  All but one of the promissory notes were executed in 2001 (and the fourth note was executed on January 1, 2002).  Mr. Calvert could not have been involved with Nature Coast until 2005, because Nature Coast did not exist until 2005.  Nature Coast was created <u>only</u> to collect on the promissory notes that were executed in 2001 and on New Year's Day 2002.  Mr. Calvert was Chairman of RTC during the relevant time period, and he was involved with Nature Coast from the moment it was created, solely to sue on the 2001-2002 promissory notes.

was supposed to transfer the notes to a new Florida company called "ExtracTech."   (Fla. Tr. 58:21-60:6, 78:2-79:2, 67:13-24). ExtracTech was set up to provide a vehicle for funding of the gas scrubber project.   (Id.; see also Fla. Tr., 32:17-33:14).   In exchange for ownership interests in ExtracTech, Stonegate was to transfer the promissory notes into the new company, and Consortium was to transfer to ExtracTech certain equipment and rights to that equipment.   (Id.).   The ExtracTech transaction never actually closed.   (Id.).

What is significant about this transaction is that the above-referenced George Calvert, President, Treasurer and Director of Nature Coast, was also the "designated President of ExtracTech". (Fla. Tr., 72:5-7).   Mr. Calvert was also an intended shareholder of ExtracTech, and he was involved in the negotiations to form ExtracTech, which took place mostly during 2000 and 2001.   (Fla. Tr., 69:14-22, 98:4-16).   Accordingly, while he was President and/or Chairman of RTC, Mr. Calvert was heavily involved with plans to transfer the Stonegate promissory notes to a new company, of which he was to be a shareholder and the designated President. (Fla. Tr. 69:14-22, 98:4-16, 72:5-7).   Mr. Calvert shows up again as the President, Treasurer and Director of Nature Coast, the entity now suing to collect on those same promissory notes. (Calvert Decl. ¶¶ 2-3; Am. Cert. of Interested Parties, ¶ 1). Accordingly, Mr. Calvert appears to be a significant link between

Nature Coast, RTC, and the promissory notes at issue in this litigation.

### c.    RTC's Bankruptcy Estate

Because this Order only addresses the issue of venue, this Court today does not make a definitive decision on Nature Coast's relationship to RTC.  However, based on the evidence submitted by the parties, especially Mr. Calvert's dual roles as President, Treasurer and Director of Plaintiff Nature Coast **and** Chairman of RTC during the relevant time period, the Court finds that Nature Coast appears related in some manner to RTC.

The *exact* relationship between Nature Coast and RTC is a key subject of Defendants' Counterclaim, and this Court finds that the ultimate decision on that issue could conceivably effect RTC's bankruptcy estate.   If Defendants are successful in their Counterclaim allegation that Nature Coast is an RTC affiliate, then RTC may have some rights to the promissory note debt at issue in this litigation.  While the promissory notes may be found void, they may also be found valid and enforceable, this Court makes no decision on that issue today.  Rather, this Court leaves that issue and the ultimate decision on Nature Coast's relationship to RTC to the Illinois Bankruptcy Court, which is very familiar with and has been working on these issues for years.[10]   However, this Court

---

[10]If Nature Coast is found to be an RTC affiliate, the enforceability of the promissory notes will necessarily involve a determination on whether RTC actually defrauded Consortium, and

determines from the evidence before it that Nature Coast <u>may</u> be an RTC affiliate, and accordingly, the ultimate decision on the promissory note debt could conceivably effect RTC's bankruptcy estate.    This is the standard for bankruptcy related-to jurisdiction, and thus the Court finds that venue would have been proper in the Northern District of Illinois, where the RTC bankruptcy case is pending.  <u>See</u> 28 U.S.C. § 1409(a); <u>see</u> <u>also</u> <u>In re Wood</u>, 825 F.2d at 92.

**C.    <u>This Case Should Be Transferred For the Convenience of the Parties and Witnesses and In the Interests of Justice</u>**

Because this case could have been brought pursuant to 28 U.S.C. § 1409(a) in the Northern District of Illinois, the next issue is whether the case should be transferred for the convenience of the parties and witnesses, and in the interests of justice.  <u>See</u> 28 U.S.C. § 1404(a).  "The determination of 'convenience' turns on a number of private and public interest factors, none of which are given dispositive weight."  <u>In re Volkswagen AG</u>, 371 F.3d at 203; <u>see</u> <u>also</u> <u>Action Indus., Inc. v. U.S. Fidelity & Guar. Co.</u>, 358 F.3d 337, 340 (5th Cir. 2004) (citing <u>Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.</u>, 796 F.2d 821, 827 (5th Cir. 1986)). The private interest factors are as follows:

    (1)   the relative ease of access to sources of proof;
    (2)   the availability of compulsory process to secure the

---

whether Nature Coast (and its predecessor in interest Stonegate) participated in the alleged fraud.

                    attendance of witnesses;
        (3)   the cost of attendance for willing witnesses; and
        (4)   all other practical problems that make trial of a
              case easy, expeditious and inexpensive.

See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n. 6 (1981).

The public interest factors are as follows:

        (1)   the administrative difficulties flowing from court
              congestion;
        (2)   the local interest in having localized interests
              decided at home;
        (3)   the familiarity of the forum with the law that will
              govern the case; and
        (4)   the avoidance of unnecessary conflict of law
              problems involving the application of foreign law.

See id; In re Volkswagen, 371 F.3d at 203.  With regard to the

public factors, "[c]ourts also consider judicial economy, that is

whether a transfer would avoid duplicative litigation and prevent

waste of time and money."  Jordan v. Dixie Pump and Supply, Inc.,

2006 WL 861022, *1 (E.D. La. 2006); see also Zoltar Satellite Sys.,

Inc. v. LG Electronics Mobile Communications Co., 402 F.Supp.2d

731, 735 (E.D. Tex. 2005) (the public interest factors encompass

the "interest[s] of justice consideration", and the interests of

justice include consideration of judicial economy); Gregoire v.

Delmar System, Inc., 2005 WL 3541051 (E.D. La. 2005) ("As an

additional public interest factor, courts consider judicial

economy--that is, whether a transfer would avoid duplicative

litigation and prevent waste of time and money.").

        The plaintiff's choice of forum is entitled to deference, but

where the plaintiff chose to bring the case is *not conclusive or*

*outcome determinative*.  See In re Horseshoe Entm't, 337 F.3d at 434 (the "plaintiff's choice of forum is clearly a factor to be considered but in and of itself it is neither conclusive nor determinative"); Symbol Technologies, Inc. v. Metrologic Instruments, Inc., 450 F.Supp.2d 676, 677 (E.D. Tex. 2006) (same).

In this case, both the public and private factors weigh strongly in favor of transferring the case to the Northern District of Illinois.

### 1.    **Private Factors**

Practically, it will be much easier to conduct a trial in this case in Chicago, where the Bankruptcy Court is already very familiar with the issues surrounding RTC and the Consortium gas scrubber project.  Discovery has already been conducted in the RTC Bankruptcy Case, other RTC witnesses are more likely to be found in the city where RTC had its principal place of business, and costs will be reduced by preventing duplicative efforts in Texas and Illinois.

As for the convenience of the parties and witnesses, the only parties and/or witnesses who would benefit from having the case proceed in Corpus Christi *are those who wish to transfer the case to Chicago*.  Other witnesses, most notably Simon Shaw and George Calvert, have no connection with Texas, and they can travel just as easily to Chicago as they can to Corpus Christi.

In fact, Mr. Calvert's residence in Spring Hill, Florida is

about the same distance from Chicago as it is to Corpus Christi.[11]
Further, Mr. Calvert acknowledges that from 1992 through 2001 he
served as President and Chairman of "a company with its principal
place of business in Chicago", and that he "testified in the [RTC]
bankruptcy proceedings", which also took place in Chicago.
(Calvert Decl., ¶ 2).  It appears it would be more convenient for
Mr. Calvert to appear in Chicago, since he served as
Chairman/President of a Chicago-based company for 9 of the past 14
years, rather than in Corpus Christi, a city to which he has no
apparent connection.  Moreover, Mr. Calvert has already submitted
to the jurisdiction of the Illinois Bankruptcy Court to testify in
the RTC bankruptcy case.

     As for Mr. Shaw, the "sole owner and operator of Stonegate",
he resides in Costa Rica, and must undertake a lengthy
international trip regardless of whether this case proceeds in
Chicago or Corpus Christi.[12]  (Shaw Decl., p. 1; Fla. Tr., 90:19-
91:5).  Chicago is a major international hub of air transportation,
and Mr. Shaw will not be inconvenienced by traveling to Illinois as
opposed to South Texas.

---

[11]Spring Hill, Florida is approximately 1170 miles from Corpus
Christi, and it is approximately 1145 miles from Chicago.

[12]The Court notes that Mr. Shaw is a major witness in this
case, and he resides outside of the United States.  Whether or not
Mr. Shaw is subject to compulsory process will not change
regardless of whether this case proceeds in Corpus Christi or in
Chicago, since Mr. Shaw resides in a foreign country, outside of
both jurisdictions.

Essentially, the only private factor weighing against transfer is that Consortium is headquartered in Corpus Christi, and that Defendant Mr. Robbins, Consortium's President and CEO, lives in Corpus Christi.[13]  (Fla. Tr. 22:6-8).  However, Consortium and Mr. Robbins *are the ones seeking the transfer*, and Consortium has already submitted to the jurisdiction of the Illinois Bankruptcy Court, through its role in the RTC Bankruptcy Case and as a Defendant in the Banco Panamericano Adversary Proceeding.[14]

Based on the above, on balance, the private factors weigh overwhelmingly in favor of transferring this case to Illinois.

### 2.   Public Factors

The public factors, especially the factor of judicial economy, also weigh overwhelmingly in favor of transfer of this case.

### a.   Judicial Economy

Defendants do not contest that they signed the promissory notes, that Stonegate funded the money, and that they have not made

---

[13]Defendant Mr. Allison resides in Oklahoma.  (Complaint, ¶ 4).

[14]The Court also notes that Plaintiff's choice of forum does not hold a great deal of weight in this case.  Plaintiff is not a resident of Texas, and initially, Plaintiff did not even bring this case in Texas.  (IPTC Tr., 11:12-12:20).  Rather, Plaintiff's first choice of forum was Florida state court.  (Id.).  Plaintiff fought to keep its case in Florida, and only brought this case in Texas *after* the Florida court dismissed Plaintiff's complaint for lack of personal jurisdiction.  (Id.).  Plaintiff's only connection to Corpus Christi appears to be its local counsel, and "the convenience of counsel is not a factor to be assessed in determining whether to transfer a case under § 1404(a)."  In re Volkswagen, 371 F.3d at 206; see also In re Horseshoe Entm't, 337 F.3d at 434.

payment on the notes.   (IPTC Tr., 15:12-17).   The only contested issues in this case are the ones in Defendants' Counterclaim, namely: (1) whether Nature Coast is an RTC affiliate; and (2) if Nature Coast is affiliated with RTC, whether the Stonegate promissory notes are null and void as part of an RTC scheme to defraud Consortium.

As noted above, very similar issues are before Judge Wedoff in the Banco Panamericano Adversary Proceeding.   Plaintiffs in both the instant case and the Banco Panamericano case are suing on promissory note debts related to the gas scrubber.   (Banco Panamericano Adversary Proceeding, D.E. 5).   Also in both cases, Consortium counterclaims against the Plaintiffs, alleging that the promissory note debts are unenforceable.   (Id.).

"To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."   DataTreasury Corp. v. First Data Corp., 243 F.Supp.2d 591, 594 (N.D. Tex. 2003); see also Jarvis Christian College v. Exxon Corp., 845 F.2d 523, 529 (5th Cir. 1988) (upholding transfer to district where other cases were pending that "involve[d] issues either identical, or substantially related, to the issues pending before the [transferor] [d]istrict."); Fisherman's Harvest, Inc. v. Weeks Marine, Inc., 401 F.Supp.2d 745, 748 (S.D. Tex. 2005) ("it would be in the interests of judicial

economy and justice to transfer this case in its entirety ... so that all of the issues may be brought before and resolved by one court.").

In this case, the issue is not whether Defendants defaulted on a series of promissory notes.  That is undisputed.  Rather, the issue is whether the promissory notes are enforceable, or whether they are void due to Defendants' allegations of fraud.  Because a very similar issue is also before Judge Wedoff in the Banco Panamericano Adversary Proceeding, "the existence of related litigation in [the] transferee court is a factor that **weighs strongly in favor of transfer**."  DataTreasury Corp., 243 F.Supp.2d at 594 (emphasis added).

### b.    Other Public Factors

Further, the Court notes that this case does not present a "local issue" that is best decided in Corpus Christi; rather, this case involves a Costa Rican investment fund, a Plaintiff that is a Florida corporation, an alleged fraudulent scheme involving an Illinois entity, all over a gas scrubber project that was centered in Alabama.  The only real connection to Corpus Christi is the location of Consortium's headquarters office, and the location of Consortium's office is not a factor in this litigation.[15]

---

[15]The Court also notes that efficiency will increase, and court congestion will correspondingly decrease, by having this case proceed in a forum that is very familiar with the background and issues of this litigation.  Further, based on the evidence before this Court, the Court does not foresee any conflict of law problems

In sum, this Court finds that the public and private factors both weigh overwhelmingly in favor of transfer of this case to Illinois.  A transfer will not inconvenience the parties and witnesses, and it will serve the interests of justice.

**IV.  <u>Conclusion</u>**

For the reasons set forth above, this Court hereby GRANTS Defendants' Motion to Transfer Venue (D.E. 35), and this Court hereby TRANSFERS this case, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of Illinois, Eastern Division, for the purpose of referring the case to the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, to proceed before Chief Judge Wedoff.

SIGNED and ENTERED on this 18th day of December, 2006.

_____
                Janis Graham Jack
         United States District Judge

--------

arising after the transfer of this case to Illinois.